Wright *v.* Wright.

WILLIAM L. WRIGHT

*v.*

JANE M. WRIGHT, administratrix of George M. Wright, deceased; HENRY B. VAUGHN, LUCY M. VAUGHN, his wife; MARY J. HEDGES and EDWARD HEDGES, her husband; RAY S. WRIGHT, GEORGE W. A. WRIGHT and WILLIAM W. GIBBS.

1. In an action by an heir against the administratrix of his father's estate and other heirs, and against V., the husband of one of the heirs, and G., to set aside assignments by complainant to G., and by the latter to V., of the former's interest in such estate, and for an account, it appeared that complainant was estranged from his family and in indigent circumstances; that his father was a man of large means; that at the time of his death his business was complicated and he was largely in debt; that two years thereafter complainant, for $250, made such assignment to G., who immediately assigned to V.; that at the time complainant had a general knowledge that assets of the estate, consisting of bonds and railroad stocks and real estate, were being suppressed, but had been repeatedly assured, and then believed, that the estate was insolvent; that G. had been interested in business with deceased and had aided the administratrix in settling the estate; that both he and V. knew the condition of the estate, and that it was not insolvent; that they knew plaintiff's circumstances, and G. represented to him that the estate was insolvent and his interest was of no real value; that prior thereto V. had told G. that he would pay not to exceed $500 for such assignment, and did pay $350 therefor; and that in distributing the suppressed assets among the heirs, which was-

Wright *v.* Wright.

done outside of the probate court, V. received the amount to which complainant would have been entitled.—*Held*, that complainant was entitled to have such assignments set aside and to a reconveyance by V. to him in such manner as to pass title to real estate, and to an account against V. of what he had received under such distribution.

. 2. The fact that complainant is of a low, degraded character, and treated his mother in an unfilial and outrageous manner, is no ground for refusing him relief.

3. Though complainant stands *in pari delicto* with V. as to the suppression of assets, such fact does not warrant withholding relief when it is not set up in the answer.

4. Since V. received, by virtue of the assignment, whatever share complainant was entitled to, he is estopped to deny that the latter was entitled to receive it.

5. Where V. exercised the controlling influence in suppressing such assets, and complainant merely acquiesced in it, the latter is not *in pari delicto*.

6. Since G. appeared by the same solicitor as the other defendants, and his answer was framed in their interest, and was untruthful, he is not entitled to costs.

On final hearing on the pleadings and proofs taken partly before a master and partly in open court.

*Mr. John W. Wescott* and *Mr. Waln* (of Philadelphia), for the complainant.

*Mr. Samuel H. Grey* and *Mr. Martin P. Grey*, for the defendants.

PITNEY, V. C.

The complainant is one of the children of George M. Wright, late of Bordentown, in the county of Burlington. He died on the 7th day of January, 1885, intestate, leaving his widow and five children him surviving. The five children are the complainant, the defendants Lucy M. Vaughn, Mary J. Hedges, Ray S. Wright and George W. A. Wright, and his widow is Jane M. Wright, who took out letters of administration upon his estate.

On the 17th of December, 1886, nearly two years after his father's death, and before any settlement of his estate, the com-

plainant conveyed and assigned to the defendant William W. Gibbs, by deed of that date, all his right, title and interest in the estate, real and personal, of which his father died seized or possessed, in consideration of the sum of $250, and by deed dated the 22d of July, 1887, Gibbs conveyed the same to the defendant Henry B. Vaughn.

The object of the bill is to set aside those conveyances and to invest the complainant with his original right in his share of the estate, and for an account of the personal estate of the decedent, and payment to the complainant of his share thereof. Other matters of relief are specially prayed for, not necessary now to be stated.

The admitted facts with regard to the conveyance by the complainant to Gibbs, and by Gibbs to Vaughn, are that complainant, some time before the 17th of December, had an interview with Gibbs, who lived and had his office in Philadelphia, in which he expressed a willingness to sell his interest in the estate; that Gibbs reported that interview to Vaughn, and that Vaughn told Gibbs he (Vaughn) was willing to purchase it if he could get it at a price not exceeding $500; that afterwards Gibbs had another interview with the complainant, when he made the purchase for $250, which he paid him in cash; that he (Gibbs) immediately drew upon Vaughn for that amount, with $100 added for his services, and Vaughn honored the draft, and that the complainant was not aware, at the time of the sale, that Vaughn was the real purchaser.

The ground upon which complainant founded his claim in his bill is therein set out substantially as follows : That the complainant, at and before the date of the transfer, was in indigent and straitened circumstances, not on good terms with his family, and was living separate from them, and that they, the defendants, knew that he was in needy circumstances, and conspired together to defraud him of his interest in his father's estate, and that they fraudulently concealed from the complainant the property and assets of the estate, and falsely represented to him that said estate was insolvent, and that his interest therein was worthless, and that he would never realize anything therefrom ; and

that on the 17th day of December, the date of the transfer, he, relying upon these false and fraudulent representations, and verily believing them to be true, and being assured by the defendants that his interest in the estate could in no event exceed in value the sum of $250, and that an assignment of his interest in the estate would greatly facilitate the settlement thereof, executed the assignment to Gibbs, who was acting for the defendants.

The bill further alleges that the defendants, when they made the representations to the complainant, knew that his share and interest in the estate was worth $25,000. The bill alleges that Vaughn, the husband of the complainant's sister, was the real purchaser of the complainant's interest. The bill then alleges the suppression of the assets of the estate by the administratrix, with the aid of the other defendants, mentioning one hundred and ninety-seven shares of stock of the Star Rubber Company, of the value of $15,000; thirty shares of the stock of the United Railroad Companies of New Jersey, of the value of $6,840, and that these shares were transferred, by virtue of a power of attorney obtained from decedent on his death-bed, to a third party without consideration, and kept from the inventory, but afterwards distributed among the defendants; that the inventory was fraudulent and defective in that it did not include the shares of stock of the Star Rubber Company before mentioned, and the stock of the United Companies of New Jersey before mentioned, and, in addition thereto, seventy-nine shares of the stock of the Bordentown Banking Company, of the value of $16,000; a note of William Bradly, of the value of $600, and a note of one Flanigan, of the value of $9,500, and other property not mentioned; and there is a general allegation that the estate was not insolvent, but solvent and worth a large sum of money.

All of the defendants except Gibbs have joined in an answer, in which they admit that they knew of the complainant's indigent and needy circumstances, but say that they were brought on by his dissipation and irregular habits; they deny that they conspired to defraud him or concealed from him the property

Wright v. Wright.

and assets of the estate, or that they falsely represented to him that the estate was insolvent and his interest worthless; allege that he was fully aware of the amount and situation of the estate, and that he knew that G. M. Wright, at the time of his death, was in debt to the amount of over $265,000, and that his estate of every kind and character, which, as appraised, amounted to $39,000, was entirely inadequate to the payment of his debts; and they charge that complainant was aware of all that was done in the way of making the inventory and in suppressing the assets; and they allege that the complainant himself sought out William W. Gibbs, who was a large creditor of the estate of George M. Wright, and urged him to buy out his share at the sum mentioned, and in so doing he was not influenced or induced thereby by any assurances or representations made by any of the defendants.

The defendant Henry B. Vaughn, answering for himself as a part of the joint answer, says—

" that the purchase of the so-called interest of said complainant in said estate of said George M. Wright was made by said William W. Gibbs *without the procurement of this defendant or his previous knowledge of his purpose so to do.* And said interest so purchased was afterwards assigned by said Gibbs to this defendant at the price or value of $350, as one of the claims against said estate, of which said Gibbs had become the owner, and which he sold and transferred to this defendant on the ———— day of ————."

The defendants last named, further answering, jointly allege that the transfer of the shares of the Star Rubber Company was made by virtue of a valid power of attorney executed by George M. Wright on the 6th day of January, the day before he died, and that the one hundred and ninety-seven shares of stock were, by virtue thereof, sold and transferred to one J. Warren Coulston, and such transfer was known to the complainant. They say that of the shares of the United Companies, nineteen were pledged for the payment of a debt and the other eleven were duly inventoried. They say that the shares of Star Rubber stock were properly excluded from the inventory *because they were sold in good faith and that the same is true of the seventy-nine shares of the Bordentown Banking Company, they having*

been transferred to *Henry B. Vaughn for a full consideration paid by him;* and that as to the Flanigan note, it was not inventoried because it was supposed to have been fully paid till it was subsequently discovered that a small balance was due by Flanigan on said note.

They allege that the estate of George M. Wright was largely insolvent and that condition was well known to the complainant; and they say that at the time of the transfer by complainant to Gibbs, said interest of complainant had no intrinsic value whatever, because of the utter insolvency of his father's estate; and they set up a final account by Mrs. Wright as administratrix, in the orphans' court of Burlington county, passed May 23d, 1888, in which she has fully accounted for the estate.

Gibbs, by his separate answer, denies that, in taking the assignment, he was acting for said other defendants, and that the sum of $250 paid by him for said complainant's share was an unconscionable price, and he

" avers the truth to be that, at the time of the death of said George M. Wright, he was a large creditor of his estate and interested in obtaining a prompt settlement thereof; that he was approached by said complainant and solicited to purchase his interest as one of the heirs and next of kin of said George M. Wright, and was told by said complainant that there had been a fraudulent concealment by said other defendants, or some of them, of the assets of said George M. Wright, and that complainant's principal object in making the statement proposing to sell his interest, so far as the defendant could understand, was to excite the defendant's suspicions and arouse his anger, and so induce the defendant to pay him something for his information; *and that the defendant was then interested in carrying through to completion the Pennsylvania, Slatington and New England railroad, a large amount of whose bonds, the property of said railroad company, were pledged as collateral for notes of said George M. Wright, and the release and possession of which bonds it was very important, at that time, for defendant to secure;* and to enable him to do so, as well as to obtain an adjustment of his own claims and of a large number of other claims against said estate then owned by defendant, it was important for this defendant to have a speedy settlement of said estate; that the hostility then displayed by complainant to any settlement, and his threats of legal proceedings to hinder and delay it, prompted this defendant to buy him off and take a transfer of his interest at the price of two hundred and fifty dollars, a sum named by said complainant, and then entirely satisfactory to him, although more than the intrinsic value of any interest which he then had in said estate, so far as this defendant was able to ascertain."

Wright v. Wright.

And he then proceeds to say—

" *that said purchase was made by this defendant for himself, and not for said Henry B. Vaughn, to whom this defendant afterwards sold said interest* for the sum of $350, together with the other claims against said estate owned by this defendant."

It will be observed that the admitted facts as above stated with regard to the conveyance by the complainant to Gibbs, and by Gibbs to Vaughn, directly contradict a part of the allegations of the answers, but are insufficient, standing by themselves, to establish the complainant's case. That depends upon several matters of fact, which may be stated thus :

*First.* What was the actual situation of the estate as to solvency or insolvency at the date of the transfer ?

*Second.* What was complainant's understanding and knowledge in that behalf ?

*Third.* What was the understanding and knowledge of Gibbs and Vaughn upon that subject ? and,

*Fourth.* What representations, if any, were made by Gibbs to complainant at and before the execution of the transfer ?

I will consider these in their order.

*First.* The decedent was a man of considerable means, and at the time of his death was possessed of a considerable amount of property. He owned several houses and lots in Bordentown, the value of which was not given, but one of them, his homestead, the title of which stood in Vaughn, was of considerable value. The inventory of his personal estate amounted to $39,000. In addition to that were the several items of what may be called the "suppressed assets," which are mentioned in the complainant's bill, and which, if they had been added to the inventory, would have swelled it to nearly $80,000, without counting $73,000 of railroad bonds presently to be mentioned. To this should be added the value of the real estate. And, in point of fact, the allegations of the bill with regard to the suppression of the Star Rubber stock and other assets are true, and the allegations of the answer in that behalf are false. The rubber stock was actually transferred to Mr. Coulston to keep it away from the creditors, and was afterwards distributed among the next of kin, excepting

the complainant. So with seventy-nine shares of the stock of the Bordentown Banking Company, transferred to Mr. Vaughn by virtue of a power of attorney executed by Mr. Wright on his death-bed. Those shares were afterwards distributed among the next of kin.

The assets which should be added to the inventory, which foots up $39,000, are as follows :

| | |
|---|---:|
| Flanigan note...... | $9,500 |
| Bradly note...... | 600 |
| One hundred and ninety-seven shares of stock of Star Rubber Company, par value $50, taken at the appraisement of one hundred and three other shares on the inventory...... | 9,850 |
| Seventy-nine shares of the Bordentown Banking Company, taken at the appraisement of other shares valued in the inventory at $150.... | 11,850 |
| Nineteen shares of railroad stock pledged with bank in Jersey City, the margin on which produced...... | 1,837 |
| Note of Gibbs...... | 3,471 |

Total of assets (not including railroad bonds) to be added to inventory, $37,108

The decedent, however, at the time of his death, was very heavily involved by reason of pecuniary engagements arising out of his attempt to build the Pennsylvania, Slatington and New England railroad across the northern part of the State of New Jersey.

[Here follows a discussion of facts, which is omitted.]

Well may the complainant put the question to the defendants, If the estate was then insolvent, when, how and by what means, and by the operation of what causes, did it become solvent? Solvent it certainly did become. What change took place after the period of the transfer from Wright to Gibbs? The fact is, that no change in the estate occurred, and that the settlement was actually made on the very state of things then existing.

, *Second.* The next question is, What was complainant's knowledge and information as to the situation of the estate?

It is plain that he knew all, or nearly all, about what are called the " suppressed assets "—excepting of course the $73,000 of railroad bonds, as to which there is no proof. His letters to his mother prove this, and he told Gibbs, as he swears, all about

Wright v. Wright.

ıthem at the first interview.  There is, however, not the least
proof or reason to believe or suspect that he had any informa-
tion whatever as to the then true condition of the estate with all
its complications as it is now developed.  He certainly was en-
tirely ignorant of the fact that Gibbs, who controlled a majority
of the claims against the estate, was willing to deliver up his
batch of them and guarantee the estate against the remainder
upon being paid the comparatively trifling sum of $20,000.
The evidence is clear that complainant believed the estate was
insolvent, and he was willing for a small sum to sell to a cred-
itor information by which the latter could increase his dividend
in the estate.

*Third.*  On the other hand, Gibbs and Vaughn, as early at
least as December 9th, 1886 (the date of Mr. Grey's letter),
knew the estate was not insolvent, but could be settled and leave
a handsome surplus to be divided among the next of kin.

[Discussion of facts omitted.]

*Lastly.*  What representations were made by Gibbs and Vaughn,
or either of them, to Wright on this subject?

Let Gibbs speak for himself.  He was called by the defend-
ants.  After stating that he had acquired Wright's interest in
December, 1886, the direct examination proceeded as follows:

"*Q.* How did negotiations open between you and him relative to your
acquiring that interest?

"*A.* Mr. Wright called at my office and requested the privilege of seeing
me; I had never seen him before or heard of him; and he presented the
situation.

"*Q.* What did he state with relation to the situation?

"*A.* He stated to me he had understood that I held large obligations against
the estate, and that it had been represented to me that the estate was insol-
vent; that he had positive information to the contrary; that there had been
a great deal of property that belonged to the estate concealed and that the
estate was of very much larger value than it had been represented to me, or
had been shown by the inventory, of which I had a copy; that he had had
more or less of trouble with them at home, and they were disposed to ignore
his relationship, or something to that effect, and that he had made up his
mind to offer me the purchase of his interest in the estate, which he thought
would help me to get a very much larger sum out of the claims I held against
the estate than I would otherwise be able to get; I asked Mr. Wright, then,
for a specific statement as to what property had been concealed or what addi-

tional value there was to the estate beyond what was shown by the inventory,. of which I had a copy, *and he named certain things which added to what was on the inventory, still left the estate very largely insolvent, and I so stated to him;* he· finally stated to me that he needed some money, and he would be willing to sell me his interest in it, which he thought would help me anyhow to some· extent in the matter, and offered it to me for $500; I told Mr. Wright I would· think of the matter and see what I could do that would be to my interest, and that if I concluded to make a purchase of his interest I would let him know, if he would leave me his address, which he did as an employe in the Pennsylvania railroad office on South Fourth street; the matter stood in that shape for some considerable length of time; I subsequently met Mr. Vaughn in the negotiations I had with him looking to the settlement of the estate, and I recounted to Mr. Vaughn what had occurred between William L. Wright and· myself—the proposition he had made—and Mr. Vaughn then told me, in a· confidential way, what he knew of the character of this man Wright, which I heard, and I subsequently asked him (Vaughn) about the value of his (Wright's) interest in the estate, and he then simply recounted to me what he· had theretofore done; *that the estate was insolvent and there was no material value in it, and that he did not think it would aid in any respect in getting any larger sum· out of the estate than was contemplated in the negotiations with him;* I subsequently had a talk with Wright—sent word for him to come to my office—*and I told him that I did not think, from all the information I could get, there was any material value in his interest,* but at the same time I was anxious to get what I could, and I had thought the matter over, and I would be willing to give him $250· for what interest he had and take an assignment of it; *my object, at the time, in· making that proposition, being to have that with me when it came to the final settlement with Mr. Vaughn.*"

[Statement of facts omitted.]

On April 7th, 1891, he made a statement to Mr. Waln, coun-· sel for the complainant, which Mr. Waln reduced to writing, on· the spot, as follows:

"George M. Wright and others were interested in the Pennsylvania, New England and Slatington Railroad Company, and borrowed money from various· parties in New Jersey, on their notes; I purchased of the trustees, for their creditors, assets in their hands and the notes, amounting to about $150,000; I had from the trustees an inventory of the property of the Wright estate, supposed to show the value of the estate; W. L. Wright called on me and stated· the estate was worth a great deal more money than contained in the inventory; I made inquiry about this young man and found he was not to be believed; he gave me all the information set out in his statement; I knew that W. L. Wright was deviling his mother, and I thought it would be an act of kindness· to get him out of the way; *before I purchased his interest, I met Mr. Vaughn,* . *and Mr. Vaughn told me to buy W. L. Wright's interest in his father's estate;* I

.*agreed with Vaughn to sell it to him, if I got it, for the same figure I gave;* the Hightstown bank got a judgment against me for $15,000; the estate of Wright paid me that; it was on a note endorsed by me for Wright."

Vaughn, in his evidence, does not deny Gibbs' account of his interview with Vaughn, in which, according to Gibbs, Vaughn ·declared the estate was insolvent.

[Here follows testimony of Vaughn, omitted.]

Taking these two accounts together, and the other evidence of Vaughn and Gibbs, it is plain that Gibbs had an interview with ·Wright some time before December 9th, 1886 (he swears not ·earlier than October 1st), which is the date of the letter from ·Grey to Mrs. Wright; that he wrote the result of the interview to Vaughn; that the letter of December 9th of Grey to Mrs. Wright brought Vaughn to Camden; that on the advice of Grey he authorized Gibbs to buy complainant's share at not more than .$500, and that it was bought by Gibbs accordingly, and that the purchase was made upon the representation to Wright, by Gibbs, ·acting for Vaughn, that the estate was insolvent, and that his object in buying it was to assist him in settling with the estate, .and that his statement to complainant was false in that respect. It is quite clear that this representation of insolvency was not ·only made at the first interview, but reiterated at the date of the .actual transfer.

William L. Wright was sworn and gave his account of the transaction before either Gibbs or Vaughn was sworn. The effect of his evidence is that about four months after his father's ·death he was driven away from the house at Bordentown, went to Philadelphia and had little or, no communication with his family from that time on, except to ask his mother for money.

[Here follows statement of facts.]

He swears that his first interview with Mr. Gibbs was in September, 1885, a year and more before the transfer, when he called upon him at his office in Walnut street. He does not state the ·object of the visit, nor what occurred.

A year later, in the fall of 1886, and previous to the transactions with Gibbs, he was at work as a clerk in the office of the

Pennsylvania railroad, and the effect of his evidence is that he did not himself seek Mr. Gibbs in the first instance, but was sent for by Mr. Gibbs to come and see him. In that he is in conflict with Mr. Gibbs, who swears that the first interview he had with Wright, which was not earlier than October 1st, 1886, was sought by Wright, and that it was for the second interview that he sent a messenger for him. Wright, on the other hand, in effect swears that he was first sent for by Gibbs relative to this affair, and that Mr. Gibbs began to talk to him about the affairs of the estate, showed him a copy of the inventory and also a number of promissory notes which his father had endorsed, amounting to about $183,000, and told him that he, Gibbs, was involved personally in the obligations arising out of the building of the railroad, and that he could get no settlement of the estate. He says that Gibbs told him that the family did not show any inclination to settle with him, and that there would be nothing left of the estate, and that if he, Gibbs, had the complainant's interest he could close the thing; that the ownership of that interest would help him to accomplish that result; and he swears that the tone of his conversation was that he was not friendly with the family, but that his feelings were hostile to them; he said the estate was insolvent after adding to the inventory the assets which were not shown on it—the suppressed assets. The complainant further swears that Gibbs stated to him that he had a knowledge, derived from other sources, that there was property belonging to his father's estate which was not on the inventory, but after adding those assets not on the inventory there was not enough to meet the liabilities, and that he stated to him distinctly that the estate was insolvent, and that his, the complainant's, interest was valueless, and that he would never be able to get anything, but that if he, Gibbs, had the complainant's interest it would help him to close the estate and get him out of trouble in his business relations. He said that the ownership of the complainant's share would help him to force a settlement of the estate, and that he would like to own the complainant's interest; and the complainant told him he would sell it to him for $500, and that he went away, and after thinking it over

Wright v. Wright.

went back to Gibbs and told him that he would take $250, and says that Gibbs shortly afterwards sent for him and had the assignment already prepared to execute, and that he went before a notary to sign it, and at that very time Gibbs assured him that the estate was perfectly worthless, and that he bought it for the purpose of helping himself out; and the complainant disavows any knowledge of the real condition of the estate as it was afterwards developed, and declared that in selling he relied partly on Mr. Grey's letter and partly on what Gibbs assured him as to the condition of the estate. He says that after that he had an interview with his brother-in-law, Vaughn, and that he reviled him and told him that it was his money that had bought his interest, and that he had given money to Gibbs to purchase it.

[Here follows statement of facts.]

The question whether Gibbs opened the negotiation for the purchase of the complainant's interest by sending for him to come and see him, or whether the complainant went of his own accord in the first instance to Gibbs and offered to sell, was discussed by counsel on both sides. Its importance lies wholly in aiding to determine the question whether or not the project of buying complainant's interest was originally set on foot by Vaughn, or whether it was taken up by him after the complainant had first intimated a disposition to sell. For I see no reason to suppose that Gibbs himself would have sent for the complainant and attempted to buy his interest, unless he had first been requested to do it by Vaughn. And if it were necessary to decide the question, I should be quite as much inclined to believe the complainant as Gibbs in that behalf. But I do not deem it necessary to determine that question. For if it be admitted that the complainant first went to Gibbs, the fact remains that Gibbs, acting in the interest of Vaughn, took advantage of the complainant's necessities and of his ignorance of the true condition of the estate, and also himself asserted what he knew to be untrue, viz., that the estate was hopelessly insolvent, by showing, first, the inventory, and then the notes to the amount of about $180,000 which he claimed to hold against the estate, and that he made a false pretense of wishing to buy it to aid himself in

Wright *v.* Wright.

settling with the administratrix. And it seems to me, if it were admitted that Vaughn did not authorize Gibbs to make any untrue representations to complainant, yet as Gibbs was, on the facts, in effect, acting as the agent for Vaughn, the latter cannot take advantage of his agent's fraud, and his title is subject to the same vice as was that of Gibbs.

No authority is necessary for the position that complainant, upon this view of the case, is entitled to relief. And I am of the opinion that his unfilial and outrageous treatment of his mother, shown by a great number of insulting letters and postals which he sent her from time to time, does not deprive him of his rights. The question is not, at this time, between the complainant and his mother or next of kin—though if it were it would make no difference—but between him and his brother-in-law, Vaughn; and his low and degraded character and general unworthiness and worthlessness do not put him beyond the protection of the law of the land, and do not give a license to anyone to practice a fraud upon him. His conduct may be immoral, it may be unworthy, it may be unfilial, but it is not inequitable in such a sense as to debar him of his right to lay hold of the horns of the altar of justice, and thus demand his right.

At the hearing, it was urged on behalf of the defendant Vaughn that, as to what has been called the "suppressed assets," complainant stands *in pari delicto* with Vaughn, and cannot ask aid from this court.

I am unable to adopt that view for several reasons. One is that it was not set up in the answer. That pleading alleges that there was no suppression—that the shares of rubber stock and of bank stock were transferred for a valuable consideration. The proof shows that they have all been distributed as a part of the estate, the bank shares having been first transferred by Vaughn to Mrs. Wright as administratrix, and by her distributed; and the defendant Vaughn, claiming as assignee of the complainant, received the share which would otherwise have come to the complainant. It seems to me that Vaughn, having received the share by reason of standing in complainant's shoes, which position he occupied as the result of a fraud practiced on

the complainant, cannot now be heard to say that complainant was never entitled to receive it. Whatever defect was in complainant's title was waived by the administratrix when she recognized Vaughn as complainant's substitute and paid and distributed to him a share of the estate. The complainant was deprived, by Vaughn's fraud, of the opportunity to assert his right to it, and cannot now be told by the person who succeeded in receiving it that he could not have succeeded if he had not parted with his right to try.

With regard to the distribution of cash—that seems to have come from various sources; and it does not appear that any special distribution was made of the proceeds of the suppressed notes &c. Then I am not satisfied by the evidence that complainant does stand *in pari delicto* in the suppression of these assets. The brains of that part of the transaction were undoubtedly furnished by Vaughn, and the complainant merely acquiesced.

The bill was filed upon the theory that this interest of the complainant in his father's estate was held by Vaughn for the benefit of the next of kin. This may be so in point of fact, but it does not appear so in the evidence. That shows that there has been from time to time a distribution, or rather several distributions, of the estate, some of it *in specie,* some of it in cash, and in that distribution it was divided into the original shares, precisely as if the complainant had not assigned his share, and the share which would have come to him was transferred to and paid to Vaughn. The complainant is at present, therefore, entitled to a decree setting aside the several transfers from himself to Gibbs, and from Gibbs to Vaughn, and for a reconveyance by Vaughn to him, in such manner as to pass title to real estate, and to an account against Vaughn of what he has received under the several distributions referred to.

The bill also prays for an accounting by the administratrix of her dealings with the estate, and that complainant may have the share in the estate which he conveyed to Gibbs. Mrs. Wright answers and sets up an accounting in the orphans court. Complainant in that situation prayed for leave to amend his bill and

attack that account. I will hear counsel as to the propriety of such an amendment.

The bill also prays that Vaughn may be decreed to convey certain premises, not described or identified, situate in Bordentown, to the heirs of George M. Wright, deceased. The allegations on which that prayer is founded, and which are sustained by the proofs, are that in the lifetime of George M. Wright he purchased and paid for certain real estate in Bordentown (not described), and had the title conveyed to Mr. Vaughn and the conveyance recorded; that Vaughn thereupon made a conveyance to George M. Wright of the same premises and delivered it to him, but that it never was recorded, and that on his death-bed that deed was produced and destroyed. I will hear counsel, also, as to whether any relief can or should be granted in that respect in this cause, or whether the complainant, when there shall have been a reconveyance to him by Vaughn, should not raise the whole question by bill for partition of that and other real estate of which Wright died seized.

The complainant is entitled to costs against Vaughn.

The defendants who joined in the answer with Vaughn and made common cause with him, are not entitled to costs. The complainant proved gross errors in the inventory and account in the orphans court, and failed to obtain a decree in that behalf simply because he had failed to set up and attack it in advance. The indications are that the distribution of the estate has been made quite irrespective of that accounting, and that the accounting to be had against Vaughn in this cause will give complainant all he is entitled to in that respect.

Gibbs appeared by the same solicitor as the other defendants, and his answer was framed in their interest, and was untruthful. He is not entitled to costs.